400 A.2d 1297

**In the Matter of the ESTATE of Viola E. Sink
BALDWIN, Deceased.**

**Appeal of FLINT and the Marine Bank, Executor of
the Estate of R. B. Way.**

Supreme Court of Pennsylvania.

Submitted March 5, 1979.

Decided May 1, 1979.

34

John P. Leemhuis, Quinn, Gent, Buseck & Leemhuis, Inc., Erie, for appellants.

John A. Spaeder, Marsh, Spaeder, Bauer, Spaeder & Schaff, Erie, for appellee.

Before EAGEN, C. J., and O'BRIEN, NIX, MANDERINO and LARSEN, JJ.

## OPINION

NIX, Justice.

This case presents the question of whether a broker is entitled to a commission arising out of the sale of real estate where the sale occurred after the expiration of his brokerage contract and in which he was not the effective and procuring cause of the sale. For the reasons that follow, we agree with the Orphans' Court Division of the Erie County Court of Common Pleas that the brokers in this case are not entitled to a commission. We, therefore, affirm that court's decree denying and dismissing the brokers' claim against the estate.

Viola E. Sink Baldwin died in November, 1966, leaving as her principal asset the El Patio Motel in Erie County. On June 1, 1967, her executor, the First National Bank of Pennsylvania (Bank), entered into a Listing Contract with

R. B. Way [1] and Amos K. Flint (brokers) real estate agents in Erie, to sell the Motel for one year and stipulated a purchase price of one million dollars "cash or such other terms or such lesser price as may be agreed to by the owner in writing." The Listing Contract further provided that the brokers would earn a six percent commission on the total sale price "when a legally binding and enforceable sales agreement shall be executed, and payable . . . when the conditions therein are fulfilled."

In the Spring of 1968, Alex Butchkosky contacted an officer of the Bank regarding the Motel, who referred him to the brokers. On April 10, 1968, Butchkosky and his wife submitted a written offer to the brokers to purchase the Motel for $900,000 in installments of $5,000 or more per month for a minimum of $100,000 per year. The balance of the purchase price, including interest, was to be paid on or before May 1, 1978. The bank rejected this offer.

On June 1, 1968, the Listing Contract between the Bank and the brokers expired. A new contract was executed on June 18, 1968, with the identical principal terms. The second Listing Contract expired on June 18, 1969.

In December, 1968, during the life of the second contract between the brokers and the Bank, the Butchkoskys again contacted the Bank regarding the Motel. This time they proposed to *rent* the property for ten years, paying a total rental of $480,000 in monthly installments of $4,000. The Lease Agreement executed by the Bank and the Butchkoskys on January 24, 1969 included these terms and gave the Butchkoskys an option to purchase the property for $900,000 which allowed some credit on the rental payments towards this purchase price.

In 1975, the Motel experienced financial difficulties and the Butchkoskys fell behind in the monthly rental payments and failed to pay the real estate taxes upon the property. Early in 1976, the Butchkoskys brought their rental pay-

1. R. B. Way died testate April 11, 1970, and his executor, the Marine Bank, joined Amos K. Flint in asserting the present claim against the Baldwin estate.

ments up to date but again fell behind in November and December, at which time they notified the Bank that they would vacate the Motel. When the Bank failed to find a replacement for the Butchkoskys, the old Lease Agreement was scrapped and the property was sold outright to the Butchkoskys for $428,000.[2] The Butchkoskys also paid all delinquent taxes, the back rentals for November and December, and $20,000 they were to receive from the Commonwealth's condemnation of a small part of the property. This agreement was executed on January 18, 1977 and was approved by the Orphans' Court Division the next month.

Although the brokers assert two arguments in support of their claim for a commission, the crucial foundation for each is the contention that the purchase option contained in the Lease Agreement operated as a contract of sale between the parties. The general rule is that:

> Although a broker would not be entitled to compensation for merely procuring a prospective purchaser to take an option to purchase, *his right to compensation accrues when the optionee subsequently exercises the option,* or is willing to exercise it but is prevented from doing so by the refusal of the owner to comply with his part of the agreement.

> 12 Am.Jur.2d *Brokers* § 188 (1964) (footnote omitted) (emphasis added).

Additionally, where an owner of real property contracts with a broker to give the broker the exclusive right to sell the property and the property is actually sold within the time prescribed, the broker is entitled to his commission irrespective of who causes the sale. *Stevenson v. Nichols,* 362 Pa. 25, 28, 66 A.2d 235 (1949). The brokers argue that since the Lease Agreement was entered into during the time they were the exclusive brokers of the property and, since the lessees did eventually purchase the property pursuant to

2. Had the option to purchase been exercised, the Butchkoskys would have had to pay $646,000 for the property, after deducting credits from the rental payments, a difference of $218,000 from the actual purchase price agreed upon.

the option in the lease, the brokers are entitled to their commission.

The fundamental error in the brokers' argument is their characterization of the 1977 sale of the property as the exercise of the option to purchase on the part of the Butchkoskys. The lower court, after hearing all the evidence, found as a matter of fact that the 1977 sales agreement was an entirely new agreement between the Bank and the Butchkoskys, one that did not partake of the previous Lease Agreement. In reviewing a decree of the Orphans' Court Division, the appellate court must accord great weight to the findings of fact made by the trial court, which saw and heard the witnesses. "Those findings of fact are conclusive if there is sufficient evidence to support them and if they are not based on a capricious disbelief of the witnesses." *In re Estate of Hain,* 464 Pa. 349, 354, 346 A.2d 774, 776 (1975) (citations omitted); *Billinger Estate,* 451 Pa. 77, 301 A.2d 795 (1973).

The Butchkoskys clearly despaired of operating the property profitably and attempted to give up the business. The Bank was not interested in operating a failing motel, so when it failed to find a replacement for the Butchkoskys, it decided to rid itself of its "white elephant" and sell it outright to the Butchkoskys at the best offer available. Under these circumstances, we agree with the lower court that the brokers had failed to prove that the purchase was made under the option between the parties that was drawn up while the Listing Contract was in effect.

In *Warner Brothers Theatres, Inc. v. Proffitt,* 329 Pa. 316, 320, 198 A. 56 (1938), we recognized that not every purchase of real estate by a lessee with an option thereto is an exercise of that option. In that case, a tenant under a written lease providing for an option to purchase the leased premises bought an outstanding mortgage antedating the lease, issued execution thereon upon default, and purchased the property at a sheriff's sale at a lesser price than that set forth in the purchase option. We rejected the lessor's claim that the lessee had in effect exercised its option to purchase

the property, citing favorably *Miller v. Hays & McCrea,* 71 Pa.Super. 523 (1919). In *Miller,* a real estate broker who had effected a lease of certain property with an option to purchase on the part of the lessee, was held not entitled to a commission for the subsequent sale of the same property to the same lessee because the purchase was not consumated under the terms of the option. In a factual setting quite similar to that now before us, the court in *Miller* said it was immaterial that the lessee later purchased the property at the same price as that set forth in the option, because the final sale was the result of an entirely new agreement and not the exercise of the original option.

The brokers in the instant case seize upon the fact that the ultimate purchase price was lesser than that set forth in the option, as the controlling factor in the trial court's decision. In this they are mistaken. From a reading of the trial court's opinion, it is clear that it thought the controlling factor was the fact that the Lease Agreement had been terminated and voided and a new, independent sales agreement executed in 1977. The fact that the ultimate sale was at a lesser price was a proper consideration in determining whether the 1977 sales agreement was in fact independent of the Lease Agreement, but the price reduction alone was not controlling. Other factors considered by the court were, for example, the unwillingness of the bank to operate the Motel; the bank's inability to find a tenant, buyer, or manager to replace the Butchkoskys; and the general economic condition of the geographic area.

The brokers spend a good portion of their brief raising the specter of innocent real estate brokers being victimized by unscrupulous land owners who have given tenants options to purchase the rented property, and who then enter into new agreements in order to cheat the broker out of his commission upon the sale of the property to the lessee. Yet, as the court below noted, the brokers before us failed to allege any bad faith or intent to defraud on the part of either the Bank or the Butchkoskys in scrapping the Lease Agreement and executing a new and independent

sales agreement in 1977. In the brief submitted to this Court, the brokers specifically decline to intimate that there was any collusion between the Bank and the Butchkoskys to avoid the option agreement so as to deprive the brokers of their commission. Absent an allegation of such bad faith and facts indicating an intent to defraud the brokers of their commission, we are satisfied that the decree of the lower court was correct.

Decree affirmed, each party to bear own costs.

ROBERTS, J., did not participate in the consideration or decision of this case.

MANDERINO, J., filed a dissenting opinion.

MANDERINO, Justice, dissenting.

The majority apparently agrees that the brokers would be entitled to their commission had the purchase option contained in the original agreement been exercised. Since the parties entered into a *new* agreement, the majority holds, the brokers are no longer entitled to their commission. This result puts a burden of proof upon brokers which is impossible to sustain. Anytime sellers and buyers agree on a price, other than the original selling price, a "new" agreement must be drawn up. This "new" agreement does not remove any rights of a broker to his or her commission. Furthermore, there is no way for a broker to prove that the "new" agreement was an extension of the "old" agreement.

In the case before us, the original selling price was $900,-000. The "old" agreement required the buyers to pay $646,-000 for the property. Had this agreement resulted in a sale, the brokers would have received their commission. Under the "new" agreement, the buyers paid $428,000 *plus* all delinquent taxes, back rentals and $20,000 they were to receive from the Commonwealth's condemnation of a small part of the property. The disparity between the purchase price of two agreements is not so great as to create a presumption against the broker. This disparity is even less when one considers the parties did not pay the brokers' fee

40

and could therefore "split the difference" and subtract that amount from the purchase price. This Court would not find a "new" agreement merely because the parties originally agreed upon a price of $500,000 and later changed to $495,-000. Likewise, there is no "new" agreement in this case. The brokers are entitled to their commission.

I therefore dissent.